UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| C1 DESIGN GROUP, LLC., | Case No. 1:15-cv-146-CWD |
| Plaintiff, | |
| | **MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 41)** |
| v. | |
| UNITED STATES OF AMERICA, Internal Revenue Service, | |
| Defendant. | |

**INTRODUCTION**

Plaintiff C1 Design Group, LLC., ("C1 Design") failed to timely pay its federal excise tax returns from Q3 2011 through Q1 2013. The IRS assessed late penalties totaling $28,755.39. As required by law, C1 Design later paid the penalties and back taxes before bringing this action against the United States of America to obtain a refund of the penalties. Pending before the Court is the IRS's motion for summary judgment of C1 Design's refund claim. (Dkt. 41.)

All parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. 28.) The Court heard oral argument from the parties

on November 21, 2016, after which the Court requested further submissions and briefing. (Dkt. 58.) After review of the record, consideration of the parties' arguments and relevant legal authorities, and otherwise being fully advised, the Court will deny the IRS's motion.

## FACTUAL BACKGROUND[1]

C1 Design is an innovator and manufacturer of outdoor gear, specializing in fishing reels.[2] (Dkt. 44-2 at 3.) Ryan Harrison is the President of C1 Design and one of its operating managers.[3] Harrison oversees C1 Design's financial matters, including the calculation and payment of excise taxes. (Dkt. 44-2 at 8.) Since C1 Design was founded, and until Q3 of 2010, C1 Design timely filed every tax return it was required to file and timely paid its employees' salaries, payroll withholding taxes, and excise taxes. (Dkt. 44-2 at 8.)

In October of 2010, Harrison was involved in an auto accident on his return home from a trade show. (Dkt. 46-9 at 3.) As a result of the accident, Harrison broke his clavicle, sustained whiplash, and developed PTSD. (Dkt. 46-9 at 5.) Harrison never took an official leave of absence from C1 Design following the auto accident. (Dkt. 44-2 at 17.) However, due to his injuries, Harrison "relied more heavily" on one of C1 Design's

---

[1] The facts contained in this section are undisputed unless otherwise indicated. When the facts are disputed, they are taken in the light most favorable to C1 Design, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the nonmoving party on motion for summary judgment).

[2] C1 Design Group, LLC., is comprised of Waterworks-Lamson, which encompasses all fishing related products and C1 Design Group, Inc., which encompasses its K9 Shower products. (Dkt. 45-7 at 3.)

[3] An operating manager is defined in C1 Design's Operating Agreement as a member who is also employed full-time. (Dkt. 45-7 at 3.) The other operating managers include Mark Farris (still with C1 Design) and John Talbot (former operating manager).

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 2**

other operating managers, John Talbot, to maintain and purchase C1 Design's supplies. (*Id.*) Talbot, the head of operations and the most senior C1 Design employee, was responsible for planning the purchase of parts needed for the future assembly of goods and managing suppliers so that parts arrived timely and of acceptable quality. (*Id.*) Following the accident, and unbeknownst to Harrison, Talbot was battling an alcohol problem, which interfered with his ability to effectively manage C1 Design's supply. (*Id.* at 18.)

Historically, it was C1 Design's practice to pre-order supplies consistent with projected business growth so that adequate supply would be on hand to fulfill its orders. (*Id.*) In addition, the costs of parts, if ordered in advance, were substantially less expensive. During the time period at issue, Talbot began outsourcing supplies from a local supplier at premium prices to compensate for his inability to effectively plan for business growth. (*Id.*) This, in turn, caused C1 Design's products to be less profitable on a per-unit basis, which drove down C1 Design's profits. (*Id.* at 19.) Talbot's business decisions contributed to C1 Design's net loss of nearly $200,000 in 2011. (Dkt. 44-2 at 12.)

After being alerted to C1 Design's loss in gross profit margins, Harrison soon discovered the losses were a result of Talbot's poor business decisions and terminated Talbot's employment on December 5, 2011. (Dkt. 44-2 at 19.) Out of "human kindness," C1 Design provided Talbot a severance package consisting of a $2,000 per month salary

for four months, and payment of Talbot's health benefits for one year (approximately $500 per month). (Dkt. 44-2 at 20, 22.)

C1 Design alleges the impact of Harrison's accident, Talbot's poor business decisions, and its 2011 net loss, caused the business to struggle in 2012, despite its reported net profit of $236,040.[4] (Dkt. 42-6 at 2.) During C1 Design's ongoing financial struggle, C1 Design timely filed its tax returns; however, it did not timely pay the taxes reported on its excise tax returns for Q3 2010 through Q1 2013. (Dkt. 44-2 at 8.) C1 Design alleges that, although it posted a profit in 2012, it was not sitting on cash when its excise taxes were due. Rather, all incoming cash was used to pay other taxes, salaries, and suppliers to ensure the survival of C1 Design. The Court will discuss the debts paid or other payments made by C1 Design in lieu of making its excise tax payments to the IRS during the Q3 2010 through Q1 2013 periods below.

**I. Management Guaranteed Payments**

Pursuant to C1 Design policy, "[i]f a member is also a manager actively involved in the duties of the business, they receive a salary for that. That salary is called a

---

[4] Harrison describes the long lasting impact of Talbot's decision as follows:

> First, there is a lag-time of several months from issuance of purchase order to manufacture. Then there is a several weeks to two month lag to anodize and assemble the part into a finished reel. Once the now higher-cost reel enters the finished good inventory it can sit there for a week or months before it's sold. And only when it's sold does it show up on our Income Statement in the form of higher cost of goods. It is at this point that profit is damaged by the higher cost of goods reducing the profit margin. The quality of higher-cost parts ordered today will determine the length of the time profit is impacted. If a year's work of high-cost parts are ordered today and manufactured next month or the month after, the profit and cash impact will last a year from the time of receipt of the high-cost parts from the manufacturer.

(Dkt. 45-7 at 5-6.)

guaranteed payment." (Dkt. 44-2 at 9.) During the relevant tax quarters, Harrison alleges that operating managers' guaranteed payments were not paid in full or on time.[5] (Dkt. 45-7 at 4.)

In 2010, Ryan Harrison was paid $116,216 in guaranteed payments; Mark Farris, another C1 Design partner, was paid $102,498 in guaranteed payments. (Dkt. 42-4 at 3-4.) In 2010, after all expenses including member salaries, other salaries, and taxes, C1 Design posted a profit of $85,484. (*Id.* at 2.)

In 2011, Ryan Harrison was paid $121,320 in guaranteed payments; Mark Farris was paid $97,055 in guaranteed payments; Michael Harrison, another C1 Design partner, was paid $368 in guaranteed payments. (Dkt. 42-5 at 3-5.) That year, after all expenses including member salaries, other salaries, and taxes, C1 Design posted a loss of $126,240. (*Id.* at 2.)

In 2012, Ryan Harrison was paid $204,262 in guaranteed payments; Mark Farris was paid $106,029 in guaranteed payments; Michael Harrison was paid $46,961 in guaranteed payments. (Dkt. 42-6 at 3-5.) That year, after all expenses including guaranteed payments, other salaries, and taxes, C1 Design posted a profit of $236,040. (*Id.* at 2.)

---

[5] C1 Design alleges its operating managers took less in salary during the period it did not pay its excise taxes. Specifically, in 2011, Harrison was entitled to a salary of $144,000, but was actually paid only $97,500 cash; and Farris was entitled to $96,000, but was actually paid only $88,000 cash. (Dkt. 43-2 at 2.) However, these contentions conflict with K-1's issued by C1 Design for Harrison and Farris, which indicate Harrison and Farris received guaranteed payments in the full amount they were entitled.

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 5**

In 2013, Ryan Harrison was paid $93,342 in guaranteed payments; Mark Farris was paid $109,435 in guaranteed payments; Michael Harrison was paid $68,139 in guaranteed payments. (Dkt. 42-7 at 3-5.) That year, after all expenses including salary, other salaries, and taxes, C1 Design posted a profit of $353,411. (*Id.* at 2.)

Harrison contends that, had C1 Design paid less "guaranteed payments" to operating managers, it would have risked operating managers leaving C1 Design to seek alternate employment. (Dkt. 43-1 at 16.)

## II. Payments to Creditors

During the relevant time period, C1 Design alleges "virtually all of its creditors were paid untimely… including the IRS, suppliers, and even landlords." (Dkt. 43-1 at 2.) During this time, C1 Design paid Paul Davis, one of its biggest suppliers of parts, at times when C1 Design did not pay or did not pay in full the excise taxes that were due. On March 12, 2012, Harrison sent an email to Paul Davis explaining that the problem with John Talbot purchasing bad parts was in the past, and C1 Design Group was "now 'fixed' and firing on all cylinders." (Dkt. 45-2 at 2.) Harrison explained that profits were back where they needed to be, and that C1 Design "will have record sales with another +20% year, and [C1 Design] will post record profits." (*Id.*) He explained also that C1 Design was "approaching the point where we'll be able to step up … payments per month and work toward current." (*Id.*)

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 6**

### III. Penalties and Re-payment to IRS

The IRS assessed penalties as a result of C1 Design's failure to timely pay its excise taxes. After Q1 of 2013, Harrison contacted the IRS to arrange for an installment agreement. C1 Design made monthly payments of $25,000 on past due excise tax balances in addition to timely payments on accrued taxes moving forward. C1 Design paid off its excise tax liability, including interest and penalties, on June 6, 2014.

## PROCEDURAL BACKGROUND

On August 11, 2014, C1 Design sought abatement of the penalties associated with its failure to timely pay its excise taxes from Q3 2010 through Q1 2013 by submitting an appeal to the IRS. In the course of its investigation, the IRS agreed that reasonable cause existed for C1 Design's failure to pay the tax and abated penalties for the first four quarters of the relevant time period, from Q3 2010 through Q2 2011. However, the IRS denied abatement of penalties for the last seven quarters, from Q3 2011 to Q1 2013. C1 Design exhausted its administrative remedies regarding the denial, as required by 26 U.S.C. § 7422(a).

On April 30, 2015, C1 Design filed its complaint seeking refund of its penalty payments from Q3 2011 to Q1 2013. (Dkt. 1.) This action is governed by 26 U.S.C. § 7422. Whether the penalty should be abated is determined *de novo* without deference to the decision of the IRS. *Pac. Wallboard & Plaster Co. v. United States*, 319 F. Supp. 2d 1187, 1188 (D. Or. 2004), *aff'd,* No. 04-35511, 2005 WL 3113470 (9th Cir. Nov. 22, 2005).

## STANDARD OF LAW

Federal Rule of Civil Procedure 56 directs the Court to "grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims…." *Celotex Corp v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*, 477 U.S. at 323). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## DISCUSSION

The IRS seeks summary judgment against C1 Design on the ground that C1 Design cannot establish that its failures to timely pay its excise tax liabilities were due to

reasonable cause—a defense to the imposition of penalties under 26 U.S.C. §§ 6651(a)(1) and 6656(a). For the reasons that follow, the Court will deny the IRS's motion.

## I. Refund of Penalties Standard Pursuant to 26 U.S.C. §§ 6651(a) and 6656(a)

The Internal Revenue Code imposes a mandatory penalty for failure to timely pay taxes in a government depository unless the taxpayer can demonstrate that such failure was due to "reasonable cause and not due to willful neglect." 26 U.S.C. §§ 6651(a) and 6656(a). In addressing the application of Section 6651(a)(1), the United States Supreme Court established that, in seeking a refund, the taxpayer bears the "heavy burden of proving" by a preponderance of the evidence, "both (1) that the failure did not result from 'willful neglect' and (2) that the failure was 'due to reasonable cause.'"*U.S. v. Boyle*, 469 U.S. 241, 245(1985).

The Supreme Court has defined willful neglect as "a conscious, intentional failure or reckless indifference."[6] *Id.* at 690. The United States Treasury regulations interpreting the "reasonable cause" provision of Section 6651(a) provides in relevant part:

> If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship (as described in § 1.6161–1(b) of this chapter) if he paid on the due date.

26 C.F.R. § 301.6651-1(c)(1).

---

[6] Neither "reasonable cause" nor "willful neglect" are defined in the Internal Revenue Code.

"26 C.F.R. § 301.6651-1(c)(1) sets a threshold requirement and then two prongs of the reasonable cause inquiry." *St. Paul Cathedral Sch. v. United States*, 2008 WL 5121928, at *3 (E.D. Wash. Dec. 5, 2008). "First, a taxpayer must show that it exercised ordinary business care." *Id.* Second, the taxpayer may excuse its failure to pay by showing either: (1) the taxpayer was unable to pay the tax; or (2) the taxpayer would suffer an undue hardship by paying the tax on the due date." *Id.* Ultimately, in determining whether reasonable cause exists under 26 U.S.C. §§ 6651(a)(1) and 6656(a), "what elements constitute reasonable cause is a question of law; whether those elements are present is a question of fact" *Conklin Bros. of Santa Rosa v. United States*, 986 F.2d 315, 317 (9th Cir. 1993) (citing *Boyle*, 469 U.S. at 249 n. 8).

This case involves excise taxes. *See* 26 U.S.C. § 4161 (excise tax on "sporting fishing equipment" in chapter 32 of the Internal Revenue Code concerning manufacture's excise taxes). Manufacturer's excise taxes attach to the article being taxed at the time the article is sold. 26 C.F.R. § 48.0-2(b)(1).

## II. Motion for Summary Judgment

The IRS sets forth two arguments in support of its claim that C1 Design cannot prove Harrison's auto accident and its aftermath amounted to reasonable cause to excuse C1 Design from its obligation to timely pay its excise taxes during the Q3 2011 through Q1 2013 time period. First, the IRS contends C1 Design cannot prove it exercised ordinary business care and prudence during these quarters. Second, the IRS argues, for the first time in its reply brief that, C1 Design failed to carry its burden by not producing

evidence of cash on hand on the dates its excise tax payments were due—a threshold evidentiary requirement, the IRS contends, to establishing reasonable cause. The Court will address each argument below.

### A. Ordinary Business Care and Prudence

The IRS argues C1 Design did not exercise ordinary business care and prudence during Q3 2011 through Q1 2013. Specifically, the IRS contends C1 Design's poor business decisions (vis-à-vis Talbot), its decision to continue to compensate Talbot after his employment was terminated, its ability to pay other creditors before the IRS, and C1 Design's ability to continue to pay operating manager salaries supports summary judgment dismissal of the refund claim. C1 Design disagrees, and contends that consideration of all the facts and circumstances demonstrates the opposite. For the reasons that follow, the Court finds genuine issues of material fact exist as to whether a C1 Design exercised ordinary business care and prudence during the relevant tax quarters.

In determining whether a taxpayer has exercised "ordinary business care and prudence" in providing for the payment of its tax liability, consideration must be given to "all the facts and circumstances of the taxpayer's financial situation, including the amount and nature of the taxpayer's expenditures in light of the income." Treas. Reg. § 301.6651–1(c)(1). The factors include, among others, consideration of the nature of the tax which the taxpayer failed to pay, and, if relevant, the taxpayer's financial difficulties. 26 C.F.R. § 301.6651-1(c)(2) ("[F]acts and circumstances which … may constitute

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 11**

reasonable cause for nonpayment of income taxes may not constitute reasonable cause for failure to pay over taxes described in section 7501 that are collected or withheld from any other person"); *see Van Camp & Bennion v. United States*, 251 F.3d 862, 868 (9th Cir. 2001) ("[A] corporation's financial difficulties can be a factor in deciding whether to abate penalties").

The undisputed facts and circumstances of the following three cases (each of which were cited by both C1 Design and the IRS) provide further guidance for determining whether a taxpayer acted with ordinary business care and prudence: (1) *Van Camp & Bennion, P.S. v. United States*, 70 F. App'x 937 (9th Cir. 2003); (2) *Fran Corp. v. United States*, 164 F.3d 814, 815 (2d Cir. 1999); and (3) *E. Wind Indus., Inc. v. United States*, 196 F.3d 499, 505 (3d Cir. 1999). *Van Camp* and *Fran* illustrate circumstances from which the courts concluded the taxpayer could not prove ordinary business care and prudence, whereas *East Wind* demonstrates the opposite conclusion. The Court will discuss each case in turn (and then will compare these cases to the evidence in this record).

In *Van Camp*, the taxpayer corporation failed to timely pay its employment taxes due to a shareholder's illness, which resulted in the taxpayer's decrease in income—the income that was reported, the taxpayer alleged, was necessary to pay expenses to keep the business open. *Van Camp & Bennion, P.S. v. United States*, 2002 WL 373358, at *5 (E.D. Wash. Jan. 28, 2002). The United States Court of Appeals for the Ninth Circuit affirmed the district court's finding on summary judgment that the taxpayer did not prove

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 12**

it exercised ordinary business care and prudence in providing for its tax liability. *Van Camp & Bennion, P.S. v. United States*, 70 F. App'x 937 (9th Cir. 2003). In support of its decision, the district court found: (1) the taxpayer was receiving large monthly deposits that were sufficient to meet its tax obligations; (2) during the relevant tax years it paid its president over $100,000 per year; and (3) the taxpayer's tax obligation was given "very low priority in comparison to the other expenses associated with the operation of the [business]."[7] *Van Camp*, 2002 WL 373358, at *4-5.

The Second Circuit in *Fran Corp v. United States*, 164 F.3d 814, 815 (2d Cir. 1999), reached a similar conclusion. There, the taxpayer failed to make timely employment tax payments, and alleged that its payments were late because it had not been paid on two of its largest contracts. *Id.* The Second Circuit affirmed the district court's finding that the taxpayer did not prove it exercised ordinary business care and prudence during its period of financial difficulty, because the taxpayer lavishly spent its money on rent, auto leases and repairs, and entertainment in lieu of using the money to timely pay the IRS.[8] *Id.*

In contrast, in *E. Wind Indus., Inc. v. United States*, 196 F.3d 499, 505 (3d Cir. 1999), the Third Circuit found, contrary to the district court's conclusion when considering the same undisputed facts, that the taxpayer could prove it exercised ordinary

---

[7] The business's average monthly operating expenses included $11,269 for automobile and airplane expenses, $5,352 for a separate auto lease, and $12,574 for promotion and travel. *Van Camp*, 2002 WL 373358, at *4-5.

[8] The taxpayer paid monthly rent to the company's president, despite an outstanding loan of $148,636.89 made by the company to the president. *Fran Corp.*, 164 F.3d at 819.

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 13**

business care and prudence based on: (1) all income received by East Wind on government contracts was used to pay either the IRS or employee wages; (2) East Wind "did not pay suppliers, rent, health and welfare premiums, employees' union dues, and workers' compensation insurance premiums;" (3) utility companies were not paid until the companies threatened to shut off service; (4) East Wind did not pay any of its suppliers from 1982–96, which was over $7 million owed; (5) [the president] secured a mortgage on his personal residence and sold personal assets to obtain cash to pay creditors; (6) East Wind's bookkeeper provided a $65,000 loan of her personal funds to the business; and (7) [the president] sought legal and financial advice as to the bribery scheme and cash flow issues. *Id.* at 510.

The Court finds the evidence in this record regarding whether C1 Design exercised ordinary business care and prudence during the relevant tax quarters lays somewhere in the middle of these three cases cited by the parties. C1 Design's financial difficulties all stem from Harrison's auto accident. As a result of the accident, which occurred in October of 2010, Harrison was not as involved as he previously had been in C1 Design's day-to-day operations. This prompted Harrison to place more responsibility on C1 Design's most senior operating manager, Talbot. Unbeknownst to Harrison, C1 Design claims Talbot had an alcohol problem which interfered with his ability to effectively plan for business growth and purchase parts in advance. To temporarily cover-up his poor business decisions, Talbot outsourced supplies from local suppliers at premium prices. This caused C1 Design's products to be less profitable on a per-unit basis and drove

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 14**

down C1 Design's profits. After being alerted to C1 Design's loss in gross profit margins, C1 Design claims Harrison soon realized C1 Design's loss of profits was a result of Talbot's decisions. Harrison terminated Talbot's employment on December 5, 2011. The effects of Talbot's poor business decisions, however, lingered on.[9]

C1 Design reported a net loss of nearly $200,000 in 2011. Unlike in *Van Camp* and *Fran*, there is no evidence in the record to support that C1 Design spent an egregious amount of money on rent and entertainment during the relevant quarters. In fact, C1 Design spent $615 on entertainment expenses in 2011 and had "virtually no auto leasing and auto report expenses." However, C1 Design did agree "out of human kindness" to pay Talbot a severance package of $8,000 and continued to pay Talbot's health benefits for a year after the termination of his employment. And, C1 Design prioritized another creditor, its biggest supplier of parts—Paul Davis—over the IRS. C1 Design contends it had to pay Davis, to assure to its biggest supplier that C1 Design was a going concern. Whether C1 Design prioritized other creditors (besides Davis) above the IRS and whether any creditors that were paid were essential and necessary to C1 Design's survival are factual disputes proper for the jury's consideration. *See Babcock Ctr., Inc. v. U.S. ex rel. I.R.S.*, 2013 WL 1857688, at *8 (D.S.C. May 2, 2013).

Moreover, during this time of financial difficulty, C1 Design allocated its available funds to pay its income taxes, employment taxes, and withholding taxes on time

---

[9] The IRS asserted in its motion that Talbot and C1 Design were one in the same, and thus, Talbot's alleged mismanagement cannot excuse C1 Design's failure to timely pay its excise taxes. The Court, however, finds this issue is more appropriate for the jury's determination.

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 15**

and in full. C1 Design timely filed its excise tax returns and made partial payments on its excise taxes when possible. (Dkt. 43-3 at 2.) While C1 Design's operating managers did not go to extreme measures like taking out personal loans and mortgages on their homes like the president in *East Wind*, C1 Design claims its operating manager salaries were reduced and not distributed timely during the relevant tax quarters in an effort to keep the business open. C1 Design contends that, if it compensated its operating managers any less, it risked those experienced managers leaving C1 Design.

C1 Design alleges it began experiencing financial relief after Q1 2013—at that time, Harrison contacted the IRS to arrange for a payment plan for C1 Design to cure its delinquent excise tax obligations. C1 Design paid all of its excise taxes, including penalty payments by June of 2014. Other than the late payments discussed in this order, C1 Design previously had paid its taxes on time and in full.

When viewing the evidence in the record in a light most favorable to C1 Design, the Court finds genuine issues of material fact exist as to whether C1 Design exercised ordinary business care and prudence during the relevant quarters when it failed to pay or fully pay its excise taxes. *See Conklin Bros. of Santa Rosa v. United States*, 986 F.2d 315, 317 (9th Cir. 1993) (citing *Boyle*, 469 U.S. at 249 n. 8) ("what elements constitute reasonable cause is a question of law; whether those elements are present is a question of fact").

### B. Evidence of Cash on Hand

The IRS argued for the first time in its reply brief that C1 Design failed to meet its burden of proof by not producing evidence of the cash it had on hand for each quarter its excise tax payments were due but not paid. The IRS contends that, without evidence of cash on hand, C1 Design cannot establish reasonable cause for a refund of the penalty payments. Because the IRS asserted this argument for the first time in its reply,[10] the Court allowed C1 Design to submit evidence of cash on hand, if it existed, pursuant to Fed. R. Civ. P. 56(e); the IRS had an opportunity to respond to C1 Design's filing, and the issue is ripe for review. (Dkt. 62.) As explained more fully below, the Court finds evidence of cash on hand is essential to determining whether C1 Design can establish reasonable cause.

The United States Court of Appeals for the Ninth Circuit has held that "a corporation's financial difficulties can be a factor in deciding to abate penalties." *Van Camp & Bennion v. U.S.*, 251 F.3d 862, 868 (9th Cir. 2001). However, "evidence of financial trouble, without nothing more, is not enough." *Synergy Staffing, Inc. v. U.S. I.R.S.*, 323 F.3d 1157, 1157 (9th Cir. 2003) (citing *Fran Corp. v. United States*, 164 F.3d 814, 816 (2nd Cir. 1999).

The Ninth Circuit applied the above standard in *Synergy Staffing* to assess whether the district court erred in finding that the taxpayer's evidence of its financial difficulty did

---

[10] During the hearing, the parties informed the Court that specific evidence of C1 Design's cash on hand was not disclosed in initial disclosures, and was not discussed during any depositions taken by the IRS during discovery.

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 17**

not establish reasonable cause to support abatement of penalties assessed for failure to timely deposit its payroll taxes. 323 F.3d at 1157. There, the taxpayer had put forth evidence that, during the years at issue, the taxpayer's line of credit had been reduced through no fault of its own, which adversely affected its ability to timely pay its payroll taxes. *Id.* The Ninth Circuit affirmed the district court's summary judgment decision in favor of the IRS, because the taxpayer's evidence was insufficient to demonstrate that its failure to make timely payroll deposits was due to reasonable cause. In support of its decision, the Ninth Circuit emphasized that the taxpayer had "failed to come forward with evidence of what funds it *did* have on hand each time a payroll tax was due, and [that the taxpayer] likewise failed to produce evidence of how it spent those funds in lieu of paying its taxes." *Id.*

Cases following *Synergy Staffing* have interpreted the decision to require that, where a taxpayer is seeking to have a penalty abated, the taxpayer must show what funds were available each time the tax was due, and how the taxpayer spent its available funds instead of paying the IRS. *See Pac. Wallboard & Plaster Co. v. United States*, 2005 WL 3113470, at *1 (9th Cir. Nov. 22, 2005) (finding plaintiff could not establish reasonable cause because plaintiff failed to present "*specific evidence*" of cash on hand when its taxes were due and failed to account for the expenditures it made instead of paying it taxes); *St. Paul Cathedral Sch. v. United States*, 2008 WL 5121928, at *6 (E.D. Wash. Dec. 5, 2008) (finding that the taxpayer failed to create triable issue of fact regarding undue hardship because the taxpayer did not submit sufficient evidence justifying its

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 18**

decision to pay other creditors); *TRC, Inc. v. United States*, 2011 WL 43090, at *4 (D. Nev. Jan. 6, 2011) (finding the taxpayer's "evidence and explanation fails however, to meet [taxpayer's] burden under *Synergy* as it remains unclear why such payments took precedence over tax payment obligations.").

The Court interprets the case law to require the taxpayer to produce evidence of the cash it had on hand when its excise taxes were due toward meeting its burden of establishing reasonable cause. Unlike the cases where no such evidence was presented on summary judgment, it is implicit in other evidence in this record that C1 Design had cash on hand to pay other creditors, the IRS, its operating managers, etc., when the excise taxes were not paid or not paid in full, as explained above. This, combined with the financial statements[11] filed by C1 Design per the Court's Rule 56(e) request satisfies the evidentiary showing sufficient to survive summary judgment dismissal.

## CONCLUSION

The Court finds genuine issues of material fact remain upon which a reasonable jury could conclude that C1 Design exercised ordinary business care and prudence during the quarters it failed to timely pay its excise taxes. Moreover, while the Court agrees with the IRS that evidence of cash on hand is an essential element to establishing reasonable

---

[11] In its response to the filing of evidence of cash on hand that the IRS previously complained was lacking, the IRS now objects to the admissibility of some of the financial statements. (Dkt. 62.) However, because the evidence may be presented in an admissible form at trial, it may be considered on summary judgment even if the evidence is currently presented in an inadmissible form. *Fraser v. Goodale,* 342 F.3d 1032, 1036–37 (9th Cir. 2003).

**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 19**

cause, the Court finds C1 Design has satisfied this evidentiary showing. Accordingly, the Court will deny the IRS's motion for summary judgment.

### ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Defendant's Motion for Summary Judgment (Dkt. 41) is **DENIED;** and

2)      Plaintiff's Motion to Include Evidence of "Cash on Hand" Pursuant to the

Order of the Court (Dkt. 62) is **GRANTED**.

Dated: **December 20, 2016**

Honorable Candy W. Dale
United States Magistrate Judge